IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BOBBY LADD,)
)
Plaintiff,)
)
v.) 1:17CV829
)
ANDREW SAUL,)
Commissioner of Social Security,[1])
)
Defendant.)

## MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Bobby Ladd ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I. PROCEDURAL HISTORY

Plaintiff protectively filed applications for Disability Insurance Benefits and Supplemental Security Income Benefits on March 8, 2013, alleging a disability onset date of

---

[1] Andrew Saul became Commissioner of Social Security on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul should be substituted for Nancy A. Berryhill as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

June 30, 2009 in both applications. (Tr. at 51, 291-300.)[2] He later amended his alleged onset date to July 21, 2014. (Tr. at 51.) Plaintiff's applications were denied initially (Tr. at 132-65, 202-12) and upon reconsideration (Tr. at 166-99, 214-31). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 232.) Plaintiff, along with his attorney and an impartial vocational expert, attended the subsequent video hearing on February 8, 2016. (Tr. at 51.) The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act from his alleged onset date through April 12, 2016, the date of the administrative decision. (Tr. at 70.) On July 19, 2017, the Appeals Council denied Plaintiff's request for review of this decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-7.)

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993)

---

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #8].

2

(quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, the claimant is disabled. Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" after July 21, 2014, his amended alleged onset date. Plaintiff therefore met his burden at step one of the sequential evaluation process. (Tr. at 53.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> status post right ankle fracture; alcohol use disorder; history of cannabis use; benzodiazepine use; antisocial personality disorder; depressive disorder; bipolar I disorder; and intellectual deficits[.]

(Tr. at 54.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 56-59.) The ALJ therefore assessed

---

[the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

Plaintiff's RFC and determined that he could perform medium work with the following additional limitations:

> frequent climbing of ramps and stairs; frequent kneeling, crawling, crouching, stooping and balancing; no climbing of ladders, ropes or scaffolds; occasional use of foot pedals with the bilateral lower extremities; occasional pushing and pulling with the right lower extremity; and occasional exposure to hazards. The work should be unskilled, simple, routine and repetitive in nature, and non-production oriented, with only routine changes in the work environment and not require driving an automobile for completion of job tasks. [Plaintiff] is limited to no contract with the public, and occasional contact with co-workers and supervisors.

(Tr. at 60.) Based on the RFC determination, the ALJ found at step four of the analysis that Plaintiff could perform his past relevant work as a produce clerk. (Tr. at 68.) Alternatively, the ALJ found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, he could perform other jobs available in the national economy. (Tr. at 68-70.) Accordingly, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 70.)

Plaintiff now contends that the ALJ erred in two respects. First, Plaintiff challenges the ALJ's determination at step three that he did not meet Listing 12.05C (Intellectual Disability), 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.05C (hereinafter "Listing 12.05C"). Second, Plaintiff argues that the ALJ failed to properly account for his intellectual disability and his ankle impairments in setting the RFC, particularly by failing to undertake an adequate function-by-function analysis as required by Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). After a careful review of the record, the Court finds that the ALJ's failure to properly evaluate the effects of Plaintiff's ankle impairment on his ability to stand and walk requires remand, as set out below. In light of this determination, the Court need not consider Plaintiff's additional

assignments of error, and to the extent Plaintiff's mental limitations also merit further evaluation, this analysis is best undertaken by the ALJ upon rehearing.

A. Function-by-function analysis

Plaintiff contends that the ALJ erred when assessing Plaintiff's RFC by failing to perform "a function-by-function analysis of the limitations caused by [his] . . . right ankle impairment." (Pl.'s Br. [Doc. #11] at 13.) As Social Security Ruling ("SSR") 96-8p instructs, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including the functions listed in the regulations. SSR 96-8P, 1996 WL 374184, at *1. "Only after such a function-by-function analysis may an ALJ express RFC in terms of the exertional levels of work." Monroe v. Colvin, 826 F.3d 176, 187 (4th Cir. 2016) (internal quotations and citations omitted).

In considering when an ALJ's failure to perform a function-by-function analysis necessitates remand, the Fourth Circuit rejected a *per se* rule, finding it "inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir.2013)). However, the Fourth Circuit "agree[d] with the Second Circuit that '[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Id.

With regard to his physical impairments, Plaintiff contends that the ALJ failed to "address or explain the conflicting medical evidence" relating to Plaintiff's right ankle

7

impairment. (Pl.'s Br. at 14.) After a thorough review of the record, the Court agrees that the ALJ's decision omitted significant evidence of Plaintiff's ongoing ankle problems, potentially affecting his abilities to stand, walk, and perform other work functions.

With regard to Plaintiff's ankle, the record reflects that on January 26, 2013, Plaintiff fell on ice and suffered a trimalleolar ankle fracture (Tr. at 479-80). X-rays on that date reflect:

> Acute oblique mildly displaced fracture of the distal shaft of the fibula. Acute mildly displaced fractures of the medial and posterior malleoli of the tibia. Small avulsion fracture of the lateral malleolus.

(Tr. at 482.) Plaintiff's ankle was wrapped and Plaintiff was referred for follow-up. As noted by the consultative examiner, treatment for such a break is ordinarily surgical repair. (Tr. at 436.) However, Plaintiff was without medical insurance or ability to pay, and therefore he did not have surgery to set the bones. (Tr. at 334, 345.) When Plaintiff went to the consultative examination on May 11, 2013, just over three months after he fell, the ankle was still in a splint and the x-rays were therefore obscured. (Tr. at 436.) The consultative examiner noted that he could not tell which bones were fractured because the x-ray was taken with the splint on. (Tr. at 436.) The consultative examiner did note that Plaintiff was using a wooden crutch as a full support cane, that Plaintiff was unable to do toe walking or any significant weight bearing on his right foot, and that no range of motion testing was performed on the right ankle and foot. (Tr. at 436, 438.) Plaintiff was subsequently incarcerated and received medical treatment in prison, and an x-ray taken on September 11, 2013 reflects:

> Displaced chronic fracture of the distal fibula is noted and ununited fracture fragments associated with the chronic medial malleolar fracture are also noted. Narrowing of the tibiotalar joint and other chronic findings. . . .

> IMPRESSION
> Chronic posttraumatic changes to the distal fibula and medial malleolus. Large ununited medial malleolar fracture fragment. Chronic arthrosis at the tibiotalar joint.

(Tr. at 456.) Medical records from the prison further reflect that there was still swelling, and Plaintiff received limitations on activity in prison. (Tr. at 454.) No subsequent x-rays have been taken, and Plaintiff has been without insurance and unable to obtain any further medical care for his ankle. Plaintiff's testimony, as recounted in the administrative decision, chronicles that:

> His right ankle never healed properly after having been broken in three places, and that, as a result, he has constant right ankle pain that goes up to his right hip. He further testified that he does not take any pain medication, has not had any medical treatment for his right ankle since he was released from prison [in 2013], and does not have any medical insurance or money to get it fixed. He also testified that while he uses a cane to walk all of the time, he forgot to bring it to the hearing. He also indicated at the hearing that he is capable of riding a bicycle for one-half mile, [but] requir[es] rest breaks.

(Tr. at 60.) Plaintiff described his ankle pain as increasing over time and worse with standing. (Tr. at 88, 98.) When asked later in the hearing how long he thought he could stand before having to sit down, Plaintiff answered, "Roughly 15 to 20 minutes, if that much," and even that amount of standing required use of a cane. (Tr. at 91, 100.) He stated that in prison, he was typically able to walk around to clean the yard "[r]oughly 10, 15 minutes, depending on how much he had to do, stooping and bending," but that he was permitted to sit as needed. (Tr. at 97.) Plaintiff further indicated that he had worn an ankle brace since the initial injury and was wearing it during the hearing. (Tr. at 98-99.)

In finding that Plaintiff was not as restricted as alleged and was capable of medium work, the ALJ expressly relied first on the Mary 7, 2013 consultative examination. (Tr. at 61.) The ALJ noted that:

> Upon exam, testing revealed that the claimant's cervical spine range of motion was 70% of normal, and his thoracic spine range of motion was 70 degrees on forward flexion and 20 degrees on lateral flexion, extension and rotation. However, testing further revealed that the claimant had normal range of motion for his shoulders, elbows, wrists, hands, knees, left foot and great toes.

(Tr. at 61.) None of these findings appear to bear on Plaintiff's right ankle injury. The ALJ then turned to the right ankle and noted:

> Further, while range of motion testing could not be performed on the claimant's right ankle, as the claimant had a splint on it, and while the claimant was walking with a limp, using a half cutoff crutch as cane, Dr. Egnatz indicated that a right foot x-ray revealed no fracture abnormalities, no bone or joint abnormality and no significant degenerative changes. Therefore, this evidence fully supports the exertional, postural, manipulative, hazard and driving limitations in the residual functional capacity.

(Tr. at 61.) However, the ALJ disregards the further note by the consultative examiner that "[t]he x-ray was taken with splinting material on and as stated above no fracture abnormalities could be seen in that circumstance." (Tr. at 436.) Similarly, the radiologist noted that "[f]ine bony detail [was] obscured due to overlying cast material." (Tr. at 434.) In addition, records reflect that the x-ray was taken only of Plaintiff's foot, not his ankle. (Tr. at 434.) In short, the records on which the ALJ relies show that Plaintiff's ankle was still splinted from his injury in January 2013, <u>not</u> that his x-rays were clean. Similarly, the ALJ omits any reference to the later ankle x-ray, taken on September 16, 2013, which confirms Plaintiff's account of an unset, unhealed triple fracture. As set out above, the report from that procedure notes a "[d]isplaced chronic fracture of the distal fibula" and "ununited fracture fragments associated with the

chronic medial malleolar fracture," along with "[c]hronic arthosis at the tibiotalar joint." (Tr. at 456.) Thus, the ALJ's analysis, which relies on "no fracture abnormalities, no bone or joint abnormality and no significant degenerative changes," is not supported by the actual medical evidence in the record.

The ALJ also relied on his finding that Plaintiff's alleged limitations were not consistent with three treatment records from 2014 and 2015. First, the ALJ cites to a March 9, 2014 exam. (Tr. at 62.) However, the March 9, 2014 treatment record is for an emergency room visit when Plaintiff was assaulted and suffered bruising and lacerations to his face. (Tr. at 469.) He received 11 stitches on his face and a CT scan of his head. (Tr. at 469-77.) There is no evidence of evaluation or treatment of his ankle, given the reason for the visit. The ALJ next cites to a September 8, 2014 exam. (Tr. at 62.) However, the September 8, 2014 exam was an emergency room visit for chest pain. (Tr. at 492-93.) The examination was focused on his cardiac function, and there is no evidence of evaluation or treatment of his ankle. Finally, the ALJ cites to a Daymark treatment record of September 11, 2015, which was a counseling appointment for depression. (Tr. at 541.) The ALJ notes that the record "indicated that [Plaintiff] rode his bike to Daymark and walked without difficulty. Significantly, [Plaintiff] reported that his foot was feeling better since he had been biking regularly and that he was not having any problems with pain" (Tr. at 62 (citing Tr. at 541).) However, other Daymark records during this period, which were not mentioned by the ALJ, indicate otherwise, noting that Plaintiff "walked with a limp" (Tr. at 545 (Mar. 20, 2015)), "thinks his ankle has healed a little but it continues to feel like it is sprained or broken and might need more treatment" (Tr. at 543 (June 12, 2015)), "is struggling physically with foot trouble" (Tr. at 558 (Dec. 4, 2015)),

11

and has "continued problems with his right ankle" (Tr. at 627 (Dec. 30, 2015)). The last of these records further noted Plaintiff's report that "he actually broke his ankle but it was only taped up and it has continued to bother him and feel unstable, hurts constantly, and he wants to get medical treatment but can't afford it. It hurts more when the weather is bad." (Tr. at 627.) In addition, with respect to his ability to ride a bicycle to his appointments at Daymark, Plaintiff explained that it was only a half mile and that he had to sit down at least four or five times, for about five minutes per time, during the short ride to Daymark, indicating that his ability to use his right ankle for cycling is not as great as the ALJ suggests. (Tr. at 102-04.)

Finally, the Court notes that the ALJ also rejected all of the medical opinion evidence, including the opinion of the consultative examiner that "there is virtually no work for [Plaintiff] to do, no task that I could see assigning him to" (Tr. at 65, 439), the opinion of North Carolina Department of Corrections medical provider regarding Plaintiff's physical limitations while in prison (Tr. at 65, 453-54), and the opinions of the state agency physician limiting Plaintiff to light work with additional limitations (Tr. at 64, 181). Having rejected all of the opinion evidence, the ALJ chose not to obtain a further consultative examination or medical review, and the ALJ instead relied on the misstated results of the first x-ray from May 2013 without consideration of the second x-ray from September 2013, which reflected a large ununited fracture fragment and chronic posttraumatic changes to the ankle. (Tr. at 456.) The subsequent medical records cited by the ALJ and noted above, for a facial assault, chest pains, and counseling for depression do not provide a substantial basis to reject the actual medical evidence regarding Plaintiff's unhealed ankle. At the February 8, 2016 administrative hearing, Plaintiff testified that worsening pain from his ankle injury continued to dramatically limit his

standing and ambulation. (Tr. at 87-88, 91, 97, 98-102.) The vocational expert testified at the hearing that if Plaintiff needed a cane for standing, none of the cited jobs would be available. (Tr. at 119.) In the circumstances, the Court finds that remand is required so that the ALJ can fully consider the evidence regarding Plaintiff's ankle injury and perform a function-by-function analysis of Plaintiff's ability to stand and walk.

As noted above, Plaintiff raises additional issues regarding the evaluation of his mental impairment, particularly in light of his Full Scale IQ of 61 and inability to read and write. (Tr. at 633-38.) However, in light of the remand recommended here, the ALJ can consider the currently applicable regulations and the combined impact of Plaintiff's physical and mental limitations as part of the remand in this case.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for proceedings consistent with this Recommendation. To this extent, Defendant's Motion for Judgment on the Pleadings [Doc. #12] should be DENIED, and Plaintiff's Motion for Summary Judgment [Doc. #10] should be GRANTED. However, to the extent that Plaintiff's motion seeks an immediate award of benefits, it should be DENIED.

This, the 6th day of January, 2020.

                                          /s/ Joi Elizabeth Peake
                                        United States Magistrate Judge